## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **W.R., a minor child,** | CASE NO. 1:14-CV- 2075 |
| and | **VERIFIED COMPLAINT** |
| **N.R. and G.R.,**<br>on their own behalf and on behalf of W.R., | **(JURY DEMAND)** |
| **PLAINTIFFS,** | |
| vs. | |
| **THE STATE OF OHIO<br>DEPARTMENT OF HEALTH,**<br>c/o Ohio Attorney General Mike DeWine, | |
| and | |
| **WENDY GROVE, OHIO'S IDEA<br>PART C COORDINATOR,**<br>(official capacity and individual capacity), | |
| and | |
| **UNITED STATES DEPARTMENT OF<br>EDUCATION,**<br>c/o Secretary of Education, Arne Duncan, | |
| c/o Steven M. Dettlebach, United States<br>Attorney for Northern District Ohio, | |
| **DEFENDANTS.** | |

## I.    INTRODUCTION

1.    Defendant State of Ohio Department of Health (Ohio, ODH, or Help Me Grow system) and Defendant Wendy Grove first systemically, intentionally, and categorically refused

1

to provide necessary IDEA Part C[1] early intervention services to all infants and toddlers with autism in Ohio and then similarly systemically refused to provide funding for compensatory services to remedy their past unlawful conduct.

2.      The purpose of the federal IDEA Part C statute and the related federal regulations is to "enhance the development of infants and toddlers with disabilities, to minimize their potential for developmental delay, and to recognize the significant brain development that occurs during a child's first 3 years of life."[2]  In plain disregard of well-established United States Department of Education directives protecting the welfare of infants and toddlers with disabilities, Grove and Ohio abusively withheld essential early intervention services from our society's most needy individuals:  young children with disabilities.

3.      Notwithstanding the Congressional findings supporting the need to enhance brain development as early as possible, Ohio's IDEA Part C system, managed by Defendant Grove, unlawfully predetermined to deny the early intervention service known as applied behavior analysis therapy to all autistic infants and toddlers in the State including but not limited to Plaintiff W.R.

4.      Late in 2013, under threat of federal withholding of Ohio's IDEA Part C funds, and after the United States District Court, Southern District Ohio, Western Division, ordered Ohio to provide applied behavior analysis therapy to R.Y., the plaintiff child in Case No. 1:12cv967 (Temporary Restraining Order), Ohio and Grove finally began to provide applied behavior analysis therapy to R.Y.[3]  Ten months later, W.R. was subsequently the first child in Ohio to finally, but untimely, receive planned applied behavior analysis therapy from Ohio's

---

[1] Individuals With Disabilities Education Act, 20 U.S.C. 1431, *et. seq*.  Ohio named its IDEA Part C system "Help Me Grow."

[2] 20 U.S.C. 1431(a).

[3] By settlement agreement, the federal court just vacated the TRO.

IDEA Part C system, albeit much later than his entitlement warranted and well into the time period for his critical brain development that was the focus of Congress in the IDEA Part C statute.

5. Congress enacted IDEA Part C to aid infants and toddlers with disabilities and to minimize their potential for developmental delay, minimize their need for future special education and related services, and maximize their potential to live independently in society. Congress also identified the reduction in future public expenditures to support individuals with disabilities as a primary purpose for IDEA Part C, an objective proven by independent studies.

6. Ohio and Grove continue to systemically deprive children with disabilities, including W.R., of their lawful entitlement to compensatory services awards designed to place the disabled children in the same developmental position they would have occupied but for the prior IDEA violations.

7. It is uncontroverted that W.R. is a child with moderate to severe autism. It is uncontroverted that W.R. needed timely applied behavior analysis therapy to have the proper opportunity to learn and develop. It is also uncontroverted that the Defendants systemically chose to deprive W.R. of essential applied behavior analysis therapy during the most critical developmental time of his life until he turned 2 ½ years old and now systemically continues to deprive him of compensatory services.

8. Ohio and Grove did not just deprive W.R. and other disabled children with autism of their rights under IDEA Part C. The Defendants were so culpable and acted with such deliberate indifference that they deprived W.R. and the other children of constitutional, statutory anti-discrimination, and other rights. Ohio and Grove violated the laws described in this Complaint when they first intentionally predetermined to deny W.R. and other disabled children

their entitlement to applied behavior analysis therapy and then intentionally predetermined to deny the children their necessary compensatory services.

## II.  JURISDICTION AND VENUE

9.     The Court has jurisdiction pursuant to 28 U.S.C. 1331, 28 U.S.C. 2201, *et seq.*, and 28 U.S.C. 1361.

10.    Venue is proper in this district.  W.R., N.R., and G.R. reside in the district and the Defendants do business in the district and injured the Plaintiffs in the district.

## III.  PARTIES

11.    W.R. is a minor child with moderate to severe autism.  W.R. was born June 13, 2011.

12.    N.R. and G.R. are the parents of W.R.

13.    Defendant State of Ohio Department of Health is the designated lead agency operating Ohio's IDEA Part C system (Help Me Grow) under contract with the United States.  In fiscal year 2012, for instance, USDOE contributed $14.4 million to Ohio for the federal share of Ohio's IDEA Part C system.  Ohio is also required to use its own funds in the IDEA Part C system to provide early intervention services to infants and toddlers with disabilities.   Ohio contracts with its third party agents to provide federally mandated IDEA Part C early intervention services.

14.    Defendant Wendy Grove is Help Me Grow's manager and policymaker who intentionally and in bad faith directed that W.R. and other children with disabilities first be denied applied behavior analysis therapy and then subsequently be denied compensatory services to remedy the initial unlawful deprivation.

4

15.     USDOE promulgated 34 C.F.R. Part 303 (Early Intervention Program for Infants and Toddlers with Disabilities) and, by Congressional mandate, oversees Ohio's IDEA Part C Help Me Grow system.  USDOE has a significant interest in this proceeding and is a necessary party because Ohio and Grove violated federal IDEA statutes and regulations and effectively nullified binding federal law.  As the United States Court of Appeals for the Sixth Circuit emphasized in a similar case concluding that, under the Medicaid program, Ohio had unlawfully diminished the provision of applied behavior analysis therapy to children with autism: "In a case such as this, the federal court is entitled to a clear statement of the federal agency's interpretation of the federal Act that it administers." *Parents' League for Effective Autism Services, et al. v. Jones-Kelley, et al.*, 565 F.Supp.2d 905 (S.D. Ohio 2008), *aff'd*, 339 Fed. Appx. 542 (6th Cir. 2009).

16.     USDOE instructed Ohio that USDOE is the federal agency responsible for administering IDEA Part C and USDOE "has an interest in ensuring that infants and toddlers with disabilities are not denied appropriate early intervention services in Ohio."

## IV.     STATEMENT OF FACTS

17.     W.R. is a three-year old child who has moderate to severe autism.

18.     After W.R.'s pediatrician referred W.R. to Ohio's IDEA Part C Help Me Grow system months after W.R.'s birth, Help Me Grow timely declared W.R. eligible for very limited services in December 2011 due to W.R.'s receptive and expressive communication and social and other challenges.

19.     Months before W.R. even turned one year old N.R. informed Help Me Grow that she was concerned that W.R. had autism but notwithstanding W.R.'s communication and

social limitations Help Me Grow did not evaluate N.R.'s concerns and did not provide an autism assessment for W.R.

20.     Grove has admitted that Ohio's IDEA Part C system did not assess any children with disabilities for autism.

21.     W.R. suffered notable regression in his speech and language development prior to turning one-year old.

22.     On August 28, 2012, W.R.'s pediatrician referred W.R. to Nationwide Children's Hospital in Columbus for an autism assessment.  N.R. had previously informed Help Me Grow about W.R.'s regression and again apprised Help Me Grow of her concerns that W.R. had autism.

23.     On September 13, 2012, N.R. again informed the Help Me Grow system that she had privately arranged for Nationwide Children's to assess W.R. for autism.  Help Me Grow did not offer to assess W.R. for autism or provide him ABA therapy to remediate the autism. Not only did the Help Me Grow system refuse to assess W.R. for autism it actually encouraged and induced N.R. to cancel the private assessment.  N.R. rescheduled the Nationwide assessment but the cancellation caused a several month delay in Nationwide providing the assessment.

24.     Even at the age of 21 months, W.R. had very limited expressive language development, he did not respond to his name, could not follow another's point, his language comprehension was limited, he showed little interest in other people, he engaged in repetitive, restrictive activity, and could not sustain attention.

25.     At the age of 30 months, W.R.'s overall progress remained poor.  He had significant delay in his social/emotional skills, his language development remained very delayed, and his level of autism symptom severity had not changed.  He was unable to consistently

respond to his name, he had made no progress with pointing, and his play skills were limited. W.R. remained very delayed in all domains.

26.     Nationwide concluded that W.R. had autism and a significant impairment in socialization and communication skills and he engaged in repetitive/restricted behaviors. Nationwide directed that W.R. "should participate in autism-specific programming based on principles of applied behavior analysis (ABA)." Nationwide elaborated that the ABA could be a home-based early intensive behavioral intervention program consisting of "25-40 hours per week [of] one-on-one behavioral interventions designed to target deficits in communication skills, cognitive skills, socialization skills, and self-help skills, as well as reduce any disruptive behavior."

27.     N.R. and G.R. made repeated requests to the Help Me Grow system and Grove to provide desperately needed early intervention ABA therapy to W.R. Each time, the Help Me Grow system and Grove informed N.R. and G.R. that it did not provide ABA therapy to disabled infants and toddlers with autism.

28.     Defendant Grove specifically continued her longstanding and predetermined policy, practice, and custom of instructing her subordinates that Ohio's IDEA Part C system would not provide ABA therapy to disabled children.

29.     In May 2013, Grove again expressly instructed her Help Me Grow agent in Richland County that Help Me Grow does not provide applied behavior analysis therapy as an early intervention service for children with disabilities. Exhibit A, Affidavit of Elizabeth Prather, Superintendent of the Richland County Board of Developmental Disabilities.

30.     Ohio further emphasized in writing in May 2013 that Ohio's IDEA Part C Help Me Grow system only pays for a one-time ABA consultation up to six hours and $450 but does not pay for applied behavior analysis therapy. Prather Affidavit.

31.     In response to N.R.'s direct question in May 2013, Grove intentionally ignored long-established law, ignored USDOE's directive to her, ignored her prior feigned acquiescence to the directive, and shifted responsibility for providing applied behavior analysis therapy to Richland County and stated: ". . . you asked me the following: Is W.R. at this time denied ABA Therapy with Help Me Grow? This is a question you must ask your service provider(s)." Prather Affidavit.

32.     On May 22, 2013, the Help Me Grow system Richland County service provider wrote to N.R: "Our Help Me Grow program does not offer ABA therapy." Prather Affidavit.

33.     On June 3, 2013, the Help Me Grow Richland County service provider wrote to N.R: "I am not clear how Wendy [Grove] wants the process as currently . . . [Help Me Grow] does not pay for the direct ABA [minimal amounts procured by N.R. and G.R.] W.R. is receiving." Prather Affidavit.

34.     On June 13, 2013, Grove further misdirected her Help Me Grow system Richland County agent: "It is a tough thing when our program does not cover something a parent wants and feels she needs for her child; but public program dollars are constrained by the scope of the program." In that same communication, Grove curiously referenced a USDOE guidance letter plainly instructing that IDEA Part C early intervention systems must include in a child's Individualized Family Service Plan (IFSP), and then provide, applied behavior analysis therapy as an early intervention service when necessary to meet the unique needs of an infant or toddler with a disability. Prather Affidavit.

8

35.     On June 20, 2013, Ohio's Richland County agent wrote to N.R. and G.R. yet one more time reiterating that "ABA services are not available . . . ." Prather Affidavit.

36.     Desperately trying to secure IDEA Part C early intervention services for her autistic son from Ohio and Grove, N.R. wrote to USDOE in 2013: "Our top priority was obtaining ABA therapy services for [W.R.]. We were informed by Nationwide Children's Hospital that the sooner Weston receives ABA therapy, the better his life will be . . . . I informed [Help Me Grow] that [W.R.] was diagnosed by Nationwide Children's Hospital with moderate to severe autism and mixed receptive-expressive language disorder. HMG did nothing . . . . I was informed to contact Wendy Grove . . . . Wendy Grove's treatment to my family, and more importantly to [W.R.], was appalling. Wendy informed me that it was up to my county to provide services to [W.R.]. At the same time, she was informing my county that ABA therapy is not a covered service . . . . Our son was paying the ultimate price, his life."

37.     In other words, at the same time Grove instructed N.R. and G.R. that their county was responsible for providing proper ABA services to W.R. Grove was simultaneously instructing the county that it was not permitted to provide ABA services to W.R.

38.     N.R. and G.R. requested that Grove and Ohio provide interim payments for W.R.'s necessary applied behavior analysis therapy pursuant to 34 C.F.R. 303.510(b) in order to, as the regulation provides, "prevent a delay in the timely provision of appropriate early intervention services to a child [with a disability]" because "[F]unds under this part [IDEA Part C] may be used to pay the provider of services . . . pending reimbursement from the agency or entity that has ultimate responsibility for the payment." Grove and Ohio intentionally and systemically refused to honor their obligations under 34 C.F.R. 303.510(b).

39.     All efforts by disabled children in Ohio and their families to secure needed ABA therapy were routed to Defendant Grove.  For years, up to November 2013, Grove instructed her employees and agents in the Help Me Grow system that Help Me Grow will not provide ABA therapy but instead only pays for a short one-time consultation up to $450.  The Help Me Grow system's employees and agents, directed by Grove, conveyed to N.R. and G.R., time and time again, that Ohio's IDEA Part C system would not provide ABA therapy for W.R.

40.     The United States District Court, Southern District Ohio, Western Division, held that of the primary learning language years "[a]ges birth to three are the most critical" and "[t]he potential for learning language abilities is greatest from birth to three years of age . . . ."[4]

41.     Notwithstanding the findings of Congress and the conclusions of Ohio's federal judiciary, Grove and Ohio nevertheless systemically deprived W.R. and many other disabled children of necessary early intervention applied behavior analysis therapy.

42.     The Help Me Grow system has admitted that during the relevant time frame it served children with Down syndrome the same as it served children with autism without regard to the significant individualized differences between children with those disabilities.

43.     The seriousness of the lack of intensive, consistent ABA intervention for a child with autism cannot be overstated.  Autism is a developmental disability that significantly impacts many aspects of an individual's life including communication and socialization.  Without ABA, a child with autism loses the chance to acquire the proper foundations for learning, paying attention, speaking, filtering distractions, and generally becoming "part of the world."

44.     Applied behavior analysis therapy is a science applied to modify behavior in strategically focused ways.  Teaching a child with autism includes a constant ongoing monitoring

---

[4] *Board of Education of the City School District of the City of Cincinnati v. Wilhelmy, et al.*, 2009 U.S. Dist. LEXIS 125241, 689 F.Supp.2d 970, 987 (2009), *aff'd.* 2010 U.S. Dist. LEXIS 15808.

process to measure how the child is progressing and what modifications may be required to insure continued progress.  Applied behavior analysis therapy includes the collection of extensive data about the child's status and progress because the data guides the decisions whether and how to modify the child's program.

45.     Objective data-based literature in the field of autism and applied behavior analysis supports the efficacy of the treatment and its cost-efficiency over time.   Without the research-based ABA therapy intervention and programming, W.R. and other children with autism will not progress, they are at increased risk of ongoing and escalating difficulties resulting in personal and family distress, and higher financial costs.

46.     25-40 hours/week is the typical intensity of applied behavior analysis therapy recommended by peer-reviewed scientifically-based research for a child with autism like W.R.

47.     In 1999, the U.S. Surgeon General, the nation's top public health official, stated that "[t]hirty years of research demonstrated the efficacy of applied behavioral methods in reducing inappropriate behavior and in increasing communication, learning, and appropriate social behavior [of autistic children]."

48.     Dr. Aletta Sinoff, an expert serving children with autism including W.R., and who has personal experience with W.R., emphasized that the proper way to teach W.R. was by providing him "evidence-based, effective intervention beginning as soon as possible after diagnosis."  Applied behavior analysis therapy is the autism early intervention service supported by the most evidence.  Attached Exhibit B, Sinoff Affidavit.

49.     Dr. Sinoff concluded that since Help Me Grow did not make proper intervention available to W.R. "any advantage that the child could have had from receiving the [autism] diagnosis at a younger age is lost."  Sinoff Affidavit.

11

50.     Within the past month, Dr. Sinoff saw another child with autism whose family had similarly been told by Help Me Grow that it did not provide or procure applied behavioral analysis therapy for young children with autism.  Sinoff Affidavit.

51.     The five hours/month generic services Help Me Grow provided to W.R. were wholly insufficient and inappropriate for serving a child with autism and likely to have no effect on his learning/skill development.  During the time W.R. was not provided the early intervention services he needed he did not progress.  After W.R. finally began receiving at age 2 1/2 the ABA therapy he had needed for more than one year he made substantial progress.  Sinoff Affidavit.

52.     Defendants Grove and Ohio likely compromised W.R.'s foundation of learning and successive skill development and growth.  It is not possible to reclaim this lost opportunity.  Sinoff Affidavit.

53.     Ohio and Grove made the decision years ago to not procure and provide applied behavior analysis therapy to children with autism or other disabilities.   Grove plainly and repeatedly instructed her employees and agents that they were not allowed to make applied behavior analysis therapy available to infants and toddlers with disabilities.  This was a baseless and injurious legal conclusion that Ohio and Grove generally applied to all disabled infants and toddlers with autism in Ohio.  No provision within IDEA Part C authorized Ohio and Grove to categorically exclude ABA therapy from Ohio's IDEA Part C system.

54.     Both N.R. in the case at bar and H.Y. in the similar case heard by the Southern District, Ohio, Western Division (two mothers of young children with autism) stated that they were "bullied" by Grove.

55.     Grove has testified under oath that she did not provide ABA therapy in Ohio's IDEA Part C Help Me Grow system.  She testified:  "Well, what I can tell you about applied

12

behavior analysis is that we [the State of Ohio] do not support it as a therapy." Grove is a sociologist. She has never helped prepare an Individualized Family Service Plan (IFSP). She has not studied applied behavior analysis. She has not studied behavior modification. She is not a board certified behavior analyst. She does not know any children served with applied behavior analysis therapy.

56.     Prior to finally serving W.R. at age 2 ½ beginning November 2013 and another child in Cincinnati who secured a federal court order against Grove and Ohio, the Help Me Grow system had never provided any child in Ohio with the necessary early intervention service of applied behavior analysis therapy.

57.     Notwithstanding Ohio's promise to the United States to provide disabled children "appropriate early intervention services based on scientifically based research, to the extent practicable," Help Me Grow system officials have acknowledged that Ohio failed to conform to federal IDEA Part C requirements with regard to providing exhaustive early intervention services, including applied behavior analysis therapy, to infants and toddlers with disabilities. USDOE plainly directed Ohio and other states to provide children peer-reviewed and research-based services.

58.     On December 31, 2012, Help Me Grow system agents acknowledged in their filing in federal court in the Ohio Southern District, Western Division: "To date, this therapy [applied behavior analysis therapy] has not been provided by the Help Me Grow program in Ohio."

59.     The federal court in the Southern District, New York, held in 2001 that if government officials did not provide children "with individualized education plans in disregard of each child's individual needs, plaintiffs were deprived of a protected property right."

60.     Consistent with statutory and constitutional principles, USDOE instructed Ohio and other states: "A State cannot exclude from the IFSP team's consideration services that meet the needs of the child, based on his or her assessment, and that meet this Federal definition [of 'early intervention services']." USDOE elaborated: "After an IFSP has been completed and the parents consent to the provision of the identified services, the State is required to provide all services identified on the child's IFSP and to ensure that those services are implemented according to the IFSP."

61.     Intentionally ignoring Congress's plain meaning in IDEA Part C, the accompanying federal regulations, and USDOE's interpretive opinions, Ohio and Grove categorically and systemically deprived W.R. and other disabled children of their entitlement to applied behavior analysis therapy and continue to deprive them of compensatory services. Ohio and Grove refused to allow disabled children's IFSP teams to include ABA therapy as a necessary early intervention service.

62.     34 CFR 303.13(d) provides broad possibilities for early intervention services depending upon a disabled child's unique needs:

> The services and personnel identified and defined in paragraphs (b) and (c) of this section do not comprise exhaustive lists of the type of services that may constitute early intervention services or the types of qualified personnel that may provide early intervention services.

63.     Defendants Grove and Ohio ignored 34 CFR 303.13(d) and instead knowingly and unlawfully chose to *limit* the possibilities for IDEA Part C early intervention services in Ohio. To the lifelong detriment of W.R. and other children, they refused to allow the Help Me Grow system to provide applied behavior analysis therapy until USDOE ultimately instructed Ohio that USDOE intended to withhold federal funding for Ohio's Help Me Grow system. Even then, Grove and Ohio injuriously delayed properly serving W.R.

14

64.     The judiciary has broad discretion under IDEA to fashion appropriate relief to remedy a denial of adequate services.    An award of compensatory services is an equitable remedy designed to place a child in the position it would have been in but for the violation of IDEA.  Children are entitled to funding for compensatory services due to Part C violations even after they reach the age of three so that recalcitrant agencies and officials cannot simply wait out a family.  *Wagner, et al. v. Short, et al.*, 63 F.Supp.2d 672 (D.C. Md. 1999).   One accepted form of compensatory education relief is a fund for the child's future education and service needs. *D.F., et al. v. Collingswood Borough Board of Education*, 694 F.3d 488, 498 (3rd Cir. 2012).

65.     Ohio and Grove knowingly ignored the developmental needs of disabled infants and toddlers living in Ohio for years by refusing to provide needed early intervention services to W.R. and other children.   In December 2012 the Office of Special Education and Rehabilitative Services (OSEP) within USDOE finally alerted Ohio to its noncompliance with IDEA Part C. OSEP further emphasized the nature of Ohio's noncompliance on January 29, 2013, and Ohio conceded to USDOE on that date that "we will respond as directed."  Attached Exhibit C.

66.     USDOE explicitly admonished Ohio and Grove:

> It has been brought to OSEP's attention that Ohio's administrative code and policies do not include the express language of 34 CFR §303.13(d) which states: "*Other services*.  The services and personnel identified and defined in paragraphs (b) and (c) of this section do not comprise exhaustive lists of the types of services that may constitute early intervention services or the types of qualified personnel that may provide early intervention services.   Nothing in this section prohibits the identification in the IFSP or another type of service as an early intervention service provided that the service meets the criteria in paragraph (a) of this section or of another type of personnel that may provide early intervention services in accordance with this part provided such personnel meet the requirements in 34 CFR §303.31."  In addition, Ohio does not enumerate the specific types of personnel who provide Part C services that are listed in 34 CFR §303.13(c).

> Exhibit C.

67.    Rather than acting to promptly rectify their unlawful deprivation of needed IDEA Part C early intervention services, Ohio and Grove continued to be deliberately indifferent to the rights of Ohio's disabled infants and toddlers including W.R.  Consequently, on June 26, 2013, USDOE used its regulatory enforcement authority to issue Ohio a "Stop the Clock" order:

> [T]here is one issue that will require ODH to provide a specific, written, signed assurance as its policy and implementation of its policy is inconsistent with the IDEA Part C requirement to make early intervention services available to infants and toddlers with disabilities and their families.  As noted in OSEP's January 29, 2013 memorandum . . .  Ohio must revise its definitions for "early intervention services" and "qualified personnel" in Ohio rule 3701-8-01 because they are inconsistent with the Federal IDEA Part C regulation in 34 CFR 303.13(c) and (d) because the State did not include an express provision indicating that the list of early intervention services is non-exhaustive.  The OSEP January 29, 2013 memorandum required ODH to submit with its FFY 2013 application a revised rule.  The State has not revised its rule and the pending case, *R.Y., et al. v. Ohio et al.*, Civil Action No. 1:12CV967 in the Southern District of Ohio (and the corresponding Ohio due process hearing decision) indicate that the State is implementing this rule inconsistently with IDEA Part C requirements.

Exhibit D.

68.    USDOE left no doubt to Ohio and Grove on June 26, 2013, that their prior conduct had been unlawful and that "Ohio will need to submit, as soon as possible . . . specific written assurance to OSEP that the State will . . . [make] available early intervention services, *including ABA therapy*, if identified by the child's Individualized Family Service Plan (IFSP) team as necessary to meet the unique developmental needs of a particular infant or toddler . . . ." (emphasis added).  Exhibit D.

69.    One day later, on June 27, 2013, USDOE further admonished Ohio "regarding the responsibilities of the Ohio Department of Health (ODH) to ensure the provision of early intervention services for infants and toddlers with disabilities and their families under Part C of

16

the Individuals with Disabilities Education Act (IDEA) in the State of Ohio."  USDOE warned

Ohio that:

> "The ultimate responsibility to make early intervention services available
> in the State of Ohio rests with ODH, the State lead agency, and not with a
> specific early intervention service (EIS) provider or program.  IDEA Part
> C requires that a State exercise general supervision over all EIS providers
> and programs used by a State to make available early intervention services
> to infants and toddlers within the State.  This responsibility includes the
> State ensuring that all EIS providers and programs meet the requirements
> of Part C of the IDEA and that the State monitors, enforces obligations
> against, and corrects noncompliance identified by the State against, EIS
> programs and providers . . . . If a State is aware that a provider is or will be
> in violation of IDEA, it is up to the State to address, and, as appropriate,
> redress the situation.     These are part of a State lead agency's
> responsibilities under the IDEA."  Exhibit D.

70.     USDOE also warned Ohio that USDOE had already:

> "Issued a memorandum to ODH on January 29, 2013, indicating that
> Ohio's definition for 'early intervention services' in Ohio rule 3701-8-01
> is inconsistent with the requirements in the Federal IDEA Part C
> regulation in 34 CFR 303.13 because the State did not include an express
> provision indicating that the list of early intervention services is non-
> exhaustive. *See*, 34 CFR 303.13(d). The OSEP January 29, 2013
> memorandum required ODH to submit with its FFY 2013 application a
> revised rule.  The State has not yet revised its rule." Exhibit D.

71.     USDOE could not have been clearer:

> Further, based on our review of the pending cases and the underlying due
> process decision, OSEP is concerned that the State is not implementing the
> IDEA Part C requirements regarding the State's responsibility to ensure
> the availability and provision of early intervention services promptly, such
> as applied behavioral analysis (ABA) therapy to infants and toddlers with
> disabilities . . . .

> Exhibit D.

72.     Punctuating its order to Ohio and Grove to cease and desist their unlawful

conduct, USDOE bluntly added establishing that Ohio and Grove knew for a long time that

IDEA Part C:

Enclosed are two OSEP letters, *from 2002 and 2007*, regarding the State's responsibility to make ABA therapy available as a service or a method if the child's IFSP team identifies such a service as necessary to meet the unique developmental needs for a particular infant or toddler with a disability.

Exhibit D.

73.     Ohio's July 27, 2013, response to USDOE's June 26, 2013, "Stop the Clock" memo to Ohio and Grove explicitly misrepresented to USDOE that "We have no specific knowledge of this occurrence [failing to provide an early intervention service when it was properly identified on an IFSP], and it is not, in fact, our policy."  Actually, "in fact," it is uncontroverted that Ohio and Grove specifically directed the Help Me Grow system to not include ABA therapy in disabled children's IFSPs.  Ohio's and Grove's attempted cover-up is as culpable as the original deprivations of early intervention services.

74.     Remaining dissatisfied with Ohio's disingenuous response that misleadingly omitted that Ohio and Grove had themselves directed that certain necessary early intervention services be excluded from disabled children's IFSPs, USDOE cautioned Ohio on September 5, 2013:

As you know, OSEP is monitoring the pending litigation in Ohio and is concerned with any suggestion that the implementation of IDEA Part C is only a local, and not, a State, responsibility.  *ODH, as the State lead agency under IDEA section 635(a)(10), has a "single line of responsibility" within the State of Ohio to implement IDEA Part C.*  Upon accepting IDEA Part C funds, *ODH is responsible* . . . for ensuring that Ohio has in place a "statewide" system that makes early intervention services available to all infants and toddlers with disabilities and their families in the State of Ohio.  The Department will continue to monitor developments in the pending litigation as part of its monitoring of Ohio's use of IDEA Part C funds.

Attached Exhibit D (emphasis added).

18

## V. CAUSES OF ACTION

**FIRST CAUSE OF ACTION: SYSTEMIC AND PREDETERMINED DEPRIVATION OF IDEA PART C RIGHT TO NECESSARY EARLY INTERVENTION SERVICES (20 U.S.C. 1431, *et seq.*)**

75. The Plaintiffs incorporate by reference the preceding paragraphs.

76. As a matter of policy, practice, and custom, Defendants Ohio and Grove required that the Help Me Grow system refuse to properly evaluate and assess W.R. and all other infants and toddlers with autism in Ohio.

77. Defendants Ohio and Grove systemically excluded applied behavior analysis therapy from W.R.'s IFSP and all other children's IFSPs.

78. Defendants Ohio and Grove unilaterally and categorically predetermined to withhold the early intervention service of applied behavior analysis therapy from W.R. (until December 2013) and all other infants and toddlers with autism in Ohio who needed the service.

79. The Defendants' systemic predetermination was unlawful. *Deal v. Hamilton Cty. Bd. of Education*, 392 F.3d 840 (6th Cir. 2004).

**SECOND CAUSE OF ACTION: SYSTEMIC AND PREDETERMINED DEPRIVATION OF IDEA PART C RIGHT TO COMPENSATORY SERVICES AND REIMBURSEMENT (20 U.S.C. 1431, *et seq.*)**

80. The Plaintiffs incorporate by reference the preceding paragraphs.

81. As a matter of policy, practice, and custom Defendants Ohio and Grove refuse to provide IDEA Part C compensatory services and reimbursement to the Plaintiffs and all other infants and toddlers with disabilities in Ohio previously deprived of applied behavior analysis therapy and now entitled to compensatory services and reimbursement.

82. The Defendants' systemic predetermination was unlawful. *Deal v. Hamilton Cty. Bd. of Education*, 392 F.3d 840 (6th Cir. 2004).

### THIRD CAUSE OF ACTION:  VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 (29 U.S.C. 794)

83.     The Plaintiffs incorporate by reference the preceding paragraphs.

84.     Defendants Ohio and Grove knew, as a matter of fact and a matter of law, that young children with autism require early intensive behavior intervention in order for the children to have the IDEA Part C opportunity to minimize their potential for developmental delay, minimize their need for special education and related services, and maximize their potential to live independently in society.

85.     Notwithstanding that knowledge, Ohio and Grove intentionally discriminated against W.R. and other young children with autism in Ohio, based solely on their disability, by knowingly depriving W.R. and the other children of needed applied behavior analysis therapy and then compensatory services.   Ohio's and Grove's discriminatory conduct deprived W.R. and the other children of meaningful access to and benefit from IDEA Part C.

### FOURTH CAUSE OF ACTION:  VIOLATION OF TITLE II, AMERICANS WITH DISABILITIES ACT (42 U.S.C. 12101, *et seq.*)

86.     The Plaintiffs incorporate by reference the preceding paragraphs.

87.     Defendants Ohio and Grove knew, as a matter of fact and a matter of law, that young children with autism require early intensive behavior intervention in order for the children to have the IDEA Part C opportunity to minimize their potential for developmental delay, minimize their need for special education and related services, and maximize their potential to live independently in society.

88.     Notwithstanding that knowledge, Ohio and Grove intentionally discriminated against W.R. and other young children with autism in Ohio, based solely on their disability, by knowingly depriving W.R. and the other children of needed applied behavior analysis therapy

and then compensatory services.  Ohio's and Grove's discriminatory conduct deprived W.R. and the other children of meaningful access to and benefit from IDEA Part C.

## FIFTH CAUSE OF ACTION:  DEPRIVATION OF PROTECTED PROPERTY RIGHT WITHOUT PROCEDURAL DUE PROCESS (42 U.S.C. 1983)

89.     The Plaintiffs incorporate by reference the preceding paragraphs.

90.     A child with a disability has a legitimate claim of entitlement under IDEA Part C and Ohio law to early intervention services including applied behavior analysis therapy necessary to achieve the purpose of maximizing the child's potential for self-sufficiency and reducing society's need to support the child in the future.

91.     When the State of Ohio applied for and accepted federal funds under IDEA Part C Ohio committed to the United States and the disabled children of Ohio and their families that it would provide needed early intervention services to children with disabilities.

92.     Under federal law and Ohio law, the Defendants did not retain any discretion to deny W.R. and his family their access to necessary IDEA Part C early intervention services. This law has been clearly established for many years.

93.     The Defendants' systemic and intentional predetermination to deny W.R. his entitlement to early intervention services and to compensatory services deprived W.R. of his constitutional right to procedural due process and pre-deprivation notice and hearing.

## SIXTH CAUSE OF ACTION:  DEPRIVATION OF RIGHT TO EQUAL PROTECTION OF THE LAWS (42 U.S.C. 1983)

94.     The Plaintiffs incorporate by reference the preceding paragraphs.

95.     The Defendants arbitrarily and capriciously, systemically, and intentionally denied W.R. and other young children classified with autism necessary IDEA Part C early intervention services and then compensatory services.

## SEVENTH CAUSE OF ACTION:  BREACH OF PUBLIC TRUST FIDUCIARY DUTY

96.    The Plaintiffs incorporate by reference the preceding paragraphs.

97.    Defendants Ohio and Grove have the highest public trust fiduciary responsibility to help advance the welfare of young children with disabilities in order to maximize the likelihood the children will have self-sufficient lives and to minimize the children's prospective dependence on public resources.

98.    Notwithstanding the State of Ohio's assurances to the United States that it would comply with IDEA Part C, Ohio and Grove systemically and intentionally predetermined to ignore the requirements of IDEA Part C with regard to W.R. and other children with autism and thereby deprive the children of the Congressional mandate to serve them during this most critical time for their brain development.

99.    Even after being informed by families, advocates, lawyers, and finally USDOE that they were plainly violating federal law and irreparably injuring disabled children, Ohio and Grove callously perpetuated their unlawful and injurious practices.

## EIGHTH CAUSE OF ACTION:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

100.    The Plaintiffs incorporate by reference the preceding paragraphs.

101.    Words cannot express the distress experienced by families learning that they have a child diagnosed with autism.  N.R. and G.R. experienced additional and unnecessary severe emotional distress caused by Defendant Grove's intentional obstruction of lawfully required early intervention services for W.R.

102.    Defendant Grove's intentional conduct was outrageous in character and so extreme in degree as to go beyond all possible bounds of decency.  Grove acted with intentional

22

or reckless disregard that her actions would cause N.R. and G.R. severe emotional distress beyond that which a reasonable person should be expected to endure.

103.    As a direct and proximate cause of Grove's foregoing actions the Plaintiffs have suffered damages.

## VI.    **PRAYER FOR RELIEF**

Plaintiffs W.R., N.R., and G.R. pray for:

1.    A declaration that Defendants Ohio and Grove systemically violated the rights of infants and toddlers with disabilities when they unilaterally and categorically excluded applied behavior analysis therapy from the early intervention services to which the children were lawfully entitled.

2.    $500,000 funding for compensatory services to help W.R. achieve the development level he otherwise would have achieved had Defendants Ohio and Grove not unlawfully deprived him of necessary early intervention services.

3.    Reimbursement for amounts N.R. and G.R. paid for services the Defendants refused to provide and payment for the value of their time performing services for W.R. that the Help Me Grow system should have provided but did not.

4.    Compensatory damages for W.R., N.R., and G.R. in amounts to be determined by the jury for permanent diminution in W.R.'s ability to function and increased costs to care for him, for pain and suffering, loss of consortium, and emotional distress.

5.    Punitive damages from Grove in an amount to be determined by the jury for her callous disregard of the welfare of young children with autism in Ohio and her intentional and grievously injurious conduct.

6.    Attorney's fees, expert witness fees, and costs.

23

7.     Such other relief the Court deems just and proper.

Respectfully submitted,
*/s/ Richard Ganulin*
Richard Ganulin, Esq. (0025642)
Attorney at Law
3662 Kendall Avenue
Cincinnati, Ohio 45208
(513) 405-6696
rganulin@gmail.com

Attorney for W.R., N.R. and G.R.

## VERIFICATION

State of Ohio       )

County of Richland   )

     Nicola D. Ruhl and Gary M. Ruhl, Jr., Plaintiffs in this matter and mother and father of W.R., being duly sworn, say that the factual allegations contained in this Complaint are true to the best of their knowledge.

_Nicola D. Ruhl_

_Gary M. Ruhl Jr._

Taken, sworn to and subscribed before me this 17ᵗʰ day of September, 2014.

_____
                            Notary Public

CHERYL L. YAKLICH
NOTARY PUBLIC
STATE OF OHIO
My Commission
Expires
Mar. 24, 2015

25